[Civ. No. 6777. Second Appellate District, Division Two.—June 9, 1931.]

ROBERT C. H. RUPP et al., Appellants, v. HENRY RICHARDI et al., Respondents.

Michael F. Shannon and Thomas A. Wood for Appellants.

George B. Ross, Hill, Morgan & Bledsoe and Benjamin F. Bledsoe for Respondents.

ARCHBALD, J., *pro tem.*—Plaintiffs filed their complaint claiming damages against defendants for fraud alleged to have been perpetrated in the sale of certain stock of the California Consolidated Building & Investment Corporation, belonging to the defendants Richardi. The case was tried before the court without a jury upon the issues raised by the complaint and answer, as well as upon a cross-complaint filed by the defendants Richardi against the plaintiffs upon a promissory note for the sum of $15,000 and the answer of plaintiffs and cross-defendants thereto, said latter answer setting up as a defense to the note the same acts alleged as fraud in cross-defendants' complaint in the action. The court found in effect that no fraud had been practiced and gave judgment that plaintiffs take nothing and that cross-complainants recover judgment on their cross-complaint. From such judgment this appeal is taken.

Appellants contend that the findings and judgment are not supported by the evidence and that the court erred in giving judgment for defendants, urging that the evidence is so overwhelmingly against the findings that there cannot be said to be a ''fair and reasonable ground for a difference of opinion'' (*White* v. *Greenwood,* 52 Cal. App. 737 [199 Pac. 1095, 1098]) and in consequence no conflict therein exists; that in the face of documentary evidence introduced by plaintiffs in the way of financial statements of the corporate condition, which it is contended ''show a clear case of fraud and a deliberate intent to deceive appellants and to sell them stock which was known at the time to be wholly without value'', respondents' denials create no conflict.

It was apparently plaintiffs' theory that defendant H. G. Schuck, who first interested the former in purchasing defendants Richardi's stock, went east to see plaintiffs for the

purpose of selling them the stock and that he was the Richardis' agent in all that he did there. The court found that Schuck was not at any time the agent or representative of said defendants, and also found in effect that no false or fraudulent representations were made by defendants, or any of them, to plaintiffs in said deal.

Plaintiffs entered into an agreement with defendants Richardi on December 9, 1926, for the purchase of their stock in the corporation mentioned, consisting of 333 5/6 shares of preferred stock of the par value of $100 per share and 616 shares of its common stock of no par value, including their rights to promotion stock of the corporation, which was to be divided equally between the defendant Schuck, his brother A. B. Schuck and defendant Henry Richardi and which was to be issued under permit of the corporation commissioner for promotion service rendered, one share for each share of common stock sold, not exceeding 5,000 shares, such promotion stock to be held in escrow pending further order of the corporation commissioner. It appears from such agreement that while the total purchase price of the Richardi stock was $50,000, the sum of $1848.80 only was paid in cash, a tract of land in San Joaquin County was to be deeded the Richardis and contracts to purchase certain lots were to be assigned to them, the value of all of which was fixed at $12,151.20. The balance of $36,000 was to be represented by the latter's promissory notes, one for $7,000, unsecured, one for $14,000, secured by a deed of trust on property in San Marino, California, and the $15,000 note sued on in the cross-complaint herein.

The financial statements so relied on by appellants as showing the intent and purpose of respondents as well as the alleged falsity of the statement which was admittedly shown plaintiffs by defendant Shuck prior to the date of the sale of the stock are plaintiffs' exhibit 1 (the one exhibited by defendant H. G. Schuck to plaintiffs), showing gross assets of the company to be $722,646.80 and liabilities, including capital stock, of $546,750.60, leaving surplus and undivided profits of $175,296.20 as of December 31, 1925; an auditor's report of the company's books for the year 1925, which shows total assets of $552,565.76, with a deficit of $16,052.21 on January 1, 1925, and of $7,868.51 on December 31, 1925, introduced as plaintiffs' exhibit 6; and

exhibit 7, a statement purporting to be as of December 31, 1925, showing gross assets of $637,940.97, which was produced by one Richard Roberts, a witness for plaintiff, who testified he was president of the South Pasadena National Bank and that such statement was the first one submitted to the bank, that it was presented August 6, 1926, and was "delivered by the Schucks"—"they usually came to the bank together". The latter statement is signed "California Consolidated Building and Investment Corporation, by A. B. Schuck, Secty-Treasurer". The witness further said that in his opinion some of the properties were overvalued. Asked to point out any that in his opinion were overvalued, he designated two lots. One of them was lot 67, being valued at $2,750 and improvements at $13,852.65, or a total of $16,-602.65, as shown by said exhibit 1. Examined as to values, he himself placed a value of $3,000 on lot 67. He testified that the lot was improved with a house, and while his recollection of the building seemed very indefinite and he stated he had never been inside of it, he placed a value of from $8,500 to $9,000 upon it. The properties are shown on a list apparently attached to the statement, and there are three columns for figures, designated as follows: "Land Val.", "Val. Impr.", "Total", under which the various valuations were placed; although the witness testified that he was told that the "figures represented cost prices". He further stated that the plaintiff Mr. Rupp was a director in his bank—"since the last meeting"; that defendant Henry Richardi told him, while defendant Schuck was in the east, that the latter "was there for the purpose of trying to effect the sale of his stock". This was denied by Richardi, who said that Schuck went east "to sell company stock". The other lot the witness Roberts designated as "overvalued" was lot 83. With regard to this he was asked: "Are you aware of the fact that Mr. Rupp bought and paid $21,000 for that lot? A. No, sir, I am not. Q. In February, 1926? A. No, sir, I am not. Q. Would that change your ideas as to value at all? A. It might." Such lot was valued in exhibit 7 as follows: "Land Val. 2750.00, Val. Impr. 13,225.21, Total, 15,975.21." Two other statements also relied on will be referred to hereafter.

Defendant Schuck testified that he was president of the corporation and one of its three incorporators, and that in

making up exhibit 1 they took certain items such as cash on hand, cash in bank, office and escrow, accounts and notes receivable, sales contracts receivable and subscriptions receivable from the books, but that the real estate was put in at "appraised valuation", as it was in all other statements which he helped prepare. Of such "appraised valu-. ation" he said: "The various lots that were put in at an increased price were compared with other values in and surrounding that neighborhood, surrounding those lots, and instead of taking the cost price, as set out in the books of the company, which was upon an acreage basis, we placed the valuation at what other lots were valued at, selling at in that same neighborhood. . . . Q. In other words, you endeavored to arrive at the sales price of that property? A. No. Just at a fair valuation. The sales prices are invariably higher than the prices we have placed in this statement". He further stated that the statement (exhibit 1) showed the appraisal which he, his brother and defendant Henry Richardi put on the properties. He testified that the 85 lots of the Pollard tract were put in the statement for $225,000. "Q. Yet you purchased the Pollard Tract for $170,000? A. We paid that for the raw land, and after putting in these improvements we naturally arrived at the valuation at a price, at an increased price. Q. And the improvements cost you $20,000? A. Approximately $30,-000, that is, the immediate improvements. Of course, there were other houses built around there and other improvements put in which naturally brought the valuation up higher."

The witness, defendant Schuck, testified that he first met Mr. Rupp in February, 1926, at which time he showed him a house "that was later bought by plaintiff"; that he did not discuss with him the matter of his being interested in the company until the "fall of 1926", at Scranton, Pennsylvania; that his "purpose for going east was to see Mr. Rupp, with whom we had some correspondence, about selling the company's stock". The evidence shows that a Mr. Woodworth, who was formerly employed by Rupp and was instrumental in interesting him in the property which Rupp bought of the corporation involved herein, was in the east, and that a telegram was sent by him from Scranton to the corporation on June 28, 1926, reading as follows: "Send us bank references also subscription blanks

Both Plans and New Photographs by air mail at once addressing to Rupp at Maplewood Wayne County Pa." The evidence also shows that "supplies and information as requested" were sent. On July 25, 1926, Rupp addressed a letter to A. B. Schuck from which we quote: "When Mr. Woodworth arrived here he explained the new stock that your company was offering for sale. That a block of this stock was reserved for our joint offering. We called on a few of my friends of moderate means and secured small subscriptions. I also spoke to a few of my wealthy friends and found that subscriptions could be secured . . . Some friends volunteered to give me letters of introduction to relatives and friends who are now residents of California. Frankly I feel with this entry a great deal of stock and some real estate can be sold. Not being entirely satisfied with Mr. Woodworth I decided to make a trip to California and discuss with you what might be my future if I affiliated with your company. This trip was later cancelled . . . I believe I could be of profitable service to your company. I was president of a large corporation at the age of thirty-four. . . . Please write me full particulars regarding any proposition you may have in mind and what my future with your concern might be. . . . Mr. Woodworth left subscription blanks, etc. with me." Other telegrams and letters introduced show that it was impossible for Rupp to go to California. One of his letters to A. B. Schuck, after speaking of a telegram which a broker who was interested in syndicating the stock of the company asked Rupp to send Schuck but which he did not send, says: "I was not entirely satisfied with the above telegram so did not send it. My reason and opinion is as follows: I am interested in what your plans are for my future, plus what I get for placing this issue. Personally I feel that you or your brother should come east and have a personal interview with the broker. . . . If you decide not to come east mail me full data and I will do the best I can." Previously Rupp had wired asking "Would you be interested in marketing your securities through Wall Street brokers?" to which A. B. Schuck wired in reply: "Are interested in proposition of underwriting you mentioned."

Without quoting further it is sufficient to say that the evidence shows that there were letters and wires back and

forth between the plaintiff Rupp and the two Schucks, and that eventually defendant Schuck wired that he would go east and that he did so, arriving at Scranton in the early part of September, Mr. Rupp meeting him at the depot. Defendant Schuck testified that he saw all such letters and telegrams; that the stock they were selling in the east and which he went east to sell was treasury stock of the corporation; that about $12,000 worth was sold at $150 per unit, consisting of one share of preferred at $100 and one share of common at $50; that it was sold on a commission of twenty per cent, of which Mr. Rupp received one-third; that at that time defendant Richardi together with the two Schuck brothers owned equal interest in the stock of the corporation; that defendant Richardi in October made a written proposal to sell his stock in the corporation to the Schuck brothers, which offer was transmitted to defendant Schuck by his brother, after which he talked with the plaintiff Robert Rupp about it; that Rupp and defendant Schuck returned to California on December 5, 1926, whereupon said Schuck told defendant Henry Richardi that "Mr. Rupp was here and that I had mentioned to him about his stock and that he was interested", to which Richardi responded, "All right. I will talk to him about it." The witness also testified that the two, Richardi and Rupp, settled the deal between themselves, and this is corrobrated by Richardi, who also said that he made his offer to sell his stock while defendant Schuck was in the east and that no suggestion was made to him by A. B. Schuck that he intended or wanted to sell the stock to anyone else; and the evidence is favorable to the inference that no representations were made as to the value of the stock or properties during the negotitions between said Rupp and Richardi.

With regard to exhibit 1, defendant Schuck testified that he showed it to Rupp within a week or so after he arrived in the east, as they did not "go to work right away"; that "I told him it was based on the appraised valuation of the properties. I explained to him that the Pollard Tract particularly was purchased and acreage prices paid and the improvements had been put in since and a number of homes built, which naturally enhanced the valuation of the properties and consequently the book values did not reflect the true condition of the valuations of the property",

and that Mr. Rupp said, "Yes, I understand how that is. That is O. K." One of the properties of which the stated value is complained is designated as the Idyllwild Inn property, consisting of six vacant lots and one lot improved with a family hotel of approximately twenty-one rooms, concerning which the witness was asked: "Before Mr. Rupp bought his stock of Mr. Richardi, do you know whether or not he had been on and examined this Idyllwild Inn property? A. He had been on the property. Q. Who took him on the property? A. I did. Q. Did he at that time express to you any opinion, or make any statement, in regard to the value of the Idyllwild Inn property? A. He did. Q. What did he say? A. He said, 'This is a beautiful property'. He said, 'It will be worth a lot of money some time'. Q. Did he use any concrete figure or definite sum? A. I believe he said it would be worth a million dollars."

After the sale of the Richardi stock to Rupp on December 9, 1926, according to defendant Schuck's testimony, Richardi's place in the company was immediately taken by Mr. Rupp. It appears that the real estate and improvements as shown by the books were on a cost basis; also that an auditor made a report of the financial condition of the company for the year 1926, said report being dated February 14, 1927, which, speaking of the "Profit and Loss and Surplus Account," shows that the net operating loss of the company at the close of 1925 was $23,703.11 and for 1926 was $4,876.22, making a total loss for the two years on operations of $28,579.33. Of such report defendant Schuck testified that Mr. Rupp said it was "perfectly satisfactory", after looking it over. The report also shows that the dividends on the preferred stock for the years 1925 and 1926 were unpaid. The written proposal for the sale of the Richardi stock to the Schuck brothers says: "I will accept $50,000 for the same, *plus the accrued dividends on the preferred stock to date of transfer*". Schuck testified concerning such proposal: "I just showed him (Rupp) the letter and told him it was Mr. Richardi's proposition. I had no authority to sell Mr. Richardi's stock." Defendant Richardi testified that at the time of the negotiations between himself and Rupp he asked plaintiff if he "wanted any information in the way of statements or information regarding the company", and being asked as to plaintiff's

response he said: "Well he wanted to know if the Schuck boys were honest. I assured him of that fact and he said he was perfectly satisfied and that he could take care of himself in anything else." Asked as to what was said about dividends, Richardi said: "In my propositions to the Schuck boys we retained the dividends. I wanted to have them paid to me as the company earned them, but Mr. Rupp was very strong in wanting a clean slate, that is, he wanted everything that went with the stock, and I finally conceded the collection of the dividends by himself." The agreement between the plaintiffs and defendants Richardi for the purchase and sale of the stock, and which several witnesses testified was for the most part at least dictated by Mr. Rupp, provides: "The parties of the first part [defendants Richardi] *hereby relinquish all their right to receive any accrued dividends,* or any dividends which shall hereafter accrue" on the stock sold to plaintiffs Rupp. A financial statement of the condition of the corporation, dated December 31, 1926, showing assets of $759,042.31, based on appraised value, liabilities, including surplus and undivided profits, of $180,916.94, and capital stock of the same amount, was prepared by the Schuck brothers in February, 1927, the witness Schuck testifying that plaintiff Mr. Rupp was in the room at the time and that the latter examined the statement when it was completed, saying that he "understood it; it was all right with him"; that other statements were made at various times for the purpose of obtaining loans from banks and presented by himself and Rupp to the banks with the explanation "that they were made upon appraised valuations", and that in making some of them "we would check the properties over and he [Rupp] would say, 'I think that this is put in too low. That lot is worth more money' "—being an increase in value over previous statements. According to the testimony of Schuck the property in San Marino, where their principal operations were in 1925 and 1926, "Was moving and on a rising market", until "along in the middle of 1927", when "a serious decline began which affected the real estate business generally, not only in our neighborhood but over other parts of Los Angeles and vicinity", and which continued "from that time on to the present". He also testified that in Pennsylvania he told Mr. Rupp "that the com-

pany had paid two dividends on the preferred stock but that on account of insufficient cash on hand we had not been able to pay dividends but would be able to do so upon the sale of properties then owned by the company if they could be sold at a reasonable price. I also told him that if these properties could be sold that it was possible that the common stock would draw dividends.'' It would also seem from the evidence that no complaint was made by Rupp of any fraud perpetrated on him until the summer of 1928.

The points urged as the basis for the alleged fraud, both in the briefs on appeal and apparently in the trial court, are the alleged falsity of exhibit 1, the financial statement admittedly shown to plaintiff Rupp by defendant Schuck while in the east, and the alleged misrepresentations relative to dividends being paid on the preferred stock.

■ The first point, so far as appellants are concerned, depends on whether the evidence establishes authority on the part of the defendant Schuck to represent the Richardis, as the court could very well conclude from the evidence that there were no misrepresentations made as to the condition of the company or the value of the stock after Mr. Rupp came to California with Schuck. The evidence is very voluminous and we have not attempted to set out all that tends to support the judgment and findings. However, in our opinion we have set out sufficient to show that a real conflict exists therein, and that being determined the duty of an appellate court is ended, as it is the function of the trial court to decide as to the credibility of all witnesses and as to which party the conflicting evidence favors. We cannot say that there is no evidence to support the conclusion that defendant Schuck went east to sell the treasury stock of the corporation and without any thought of interesting Mr. Rupp in the purchases of the Richardi stock; that exhibit 1 was shown and discussed in planning the stock-selling campaign, and not for the purpose of inducing plaintiffs to purchase said stock, and that at all times plaintiffs knew that the statement referred to represented merely the opinion, and even the honest opinion, of said defendants as to the value of the properties named and the stock; that as to the Idyllwild Inn property the plaintiff Robert C. H. Rupp made his own investigation and relied on his own idea of its value rather than on any representations made to

him—all of this in addition to the fact that shortly after buying the stock said Rupp was advised by the auditor's report of the actual cost of the assets of the company, and that after that he apparently approved statements similar to exhibit 1 but with an increase in the appraised value of the properties or some of them, and expressed himself as well satisfied with his investment after having had sufficient opportunity to inform himself as to the financial condition of the company, making no complaint until real estate values and the market for real estate had entered on a depression that existed until the time of trial, at least.

So far as the alleged representations as to dividends are concerned, the evidence quoted would support the inference that defendant Schuck's version of the conversation between himself and Mr. Rupp was correct for the court could well conclude that in the face of the written proposition showing that Mr. Richardi was claiming the "accrued dividends" on the stock, which defendant Schuck says he showed to Rupp, the former would hardly make the statement that the stock was paying dividends. The agreement gave plaintiffs the right to such accrued dividends, and if a false statement was made in that regard the falsity, if not known at the time the agreement was entered into, would soon have been discovered; and yet there is evidence that no complaint was made except as to payment of dividends on certain of the preferred stock sold to friends of Mr. Rupp in the east who were evidently expecting dividends, Schuck testifying that Rupp prevailed upon him to send them a personal check to cover dividends from the date of their purchases to a dividend period, when the company had no earned profits for a dividend but merely book profits on sales made on deferred payments. Of course, the evidence presented by plaintiffs is in direct conflict with that of defendants on all material points, but as we have said, it is not for us to say where the burden of proof lies, having reached the conclusion that a serious conflict exists.

Judgment affirmed.

Works, P. J., and Thompson, (Ira F.), J., concurred.